# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|                              |     |                       |
|------------------------------|-----|-----------------------|
| **JAMAL SHAKIR,**            | )   |                       |
|                              | )   |                       |
| **Movant,**                  | )   |                       |
|                              | )   |                       |
| **v.**                       | )   | **Nos.  3:17-cv-00001** |
|                              | )   | **        3:17-cv-00002** |
| **UNITED STATES OF AMERICA,**| )   |                       |
|                              | )   |                       |
| **Respondent**               | )   |                       |

## MEMORANDUM OPINION

Jamal Shakir is a prisoner currently in the custody of the State of California awaiting transfer to the Federal Bureau of Prisons to serve ten consecutive life sentences plus twenty years in prison for his federal convictions in two separate cases.  He filed two pro se Motions to Vacate, Set Aside, or Correct his federal sentences in those cases pursuant to 28 U.S.C. § 2255. (3:17-cv-00001, Doc. No. 1; 3:17-cv-00002, Doc. No. 1).  Appointed counsel later supplemented those Motions with numerous exhibits. (3:17-cv-00001, Doc. Nos. 2, 19–39; 3:17-cv-00002, Doc. Nos. 4, 22–30, 32).   Due to their related subject matter, these cases—although not consolidated—are being briefed by the parties and addressed by the Court in joint, simultaneous filings in both cases to the extent appropriate.[1]

## I.      PROCEDURAL HISTORY

On March 24, 2008, in Case No. 3:98-cr-00038-11 ("1998 case"), a jury convicted Shakir of the following crimes in violation of federal law: (Count 1) engaging in a continuing criminal enterprise; (Count 2) conspiring to distribute controlled substances and to intentionally kill or

---

[1]      Citations herein to documents filed in both Section 2255 cases will reference only the first case filed: 3:17-cv-00001.  Only documents appearing exclusively in the second case, 3:17-cv-00002, will be referenced with that matter number.

cause the killing of five people in furtherance of a continuing criminal enterprise; (Count 3) conspiring to use and/or carry firearms during and in relation to drug trafficking crimes and crimes of violence; (Counts 4, 9, 14, 31) conspiring to commit money laundering and three counts of money laundering; (Counts 5, 13, 16) three counts of using and/or carrying a firearm during and in relation to drug trafficking crimes and/or crimes of violence; (Counts 7, 10, 18, 19, 37) five counts of first-degree murder in furtherance of a continuing criminal enterprise or conspiracy to distribute drugs; (Counts 8, 11, 22, 23, 29, 39) six counts of using a firearm to cause death during and in relation to drug trafficking crimes and/or crimes of violence; (Counts 12, 30) two counts of knowingly using minors in drug trafficking; (Count 15) attempted robbery and extortion affecting commerce through the use of actual and threatened violence; (Count 17) using interstate commerce facility (interstate telephone system) to commit a crime of violence resulting in death; (Counts 20, 21, 38) three counts of unlawful killing to prevent communication of criminal activity to law enforcement; (Counts 24, 25, 26) three counts of firing a weapon into a group of people with the intent to intimidate, harass, injure, and maim, resulting in two deaths and grave risk to another life; (Count 32) possession of cocaine and cocaine base with intent to distribute; and (Counts 40, 41) two counts of obstruction of justice. (3:17-cv-00001, Doc. No. 41-8). The government sought the death penalty for eligible counts of conviction (3:98-cr-00038, Doc. No. 3239), but the jury was unable to reach a unanimous decision regarding a death sentence. (3:17-cv-00001, Doc. No. 41-9). The Court sentenced Shakir on December 7, 2009, to an effective term of ten consecutive sentences of life in prison, with fifteen additional life terms to run concurrently. (3:17-cv-00001, Doc. No. 41-10). Shakir filed a timely notice of appeal. (3:98-cr-00038, Doc. No. 3643).

In 2009, while Shakir was still awaiting sentencing on the 1998 case, evidence surfaced of new crimes Shakir was committing from jail in conjunction with associates outside of jail, including Christopher Conyers and "[s]everal people in California, including two of Shakir's relatives (Robyn Shakir and Catherine Lumas)[.]" (3:17-cv-00001, Doc. No. 42-2 at 6–11, 13). Conyers and several others were indicted for their roles in these crimes in 2009. See United States v. Conyers, et al., No. 3:09-cr-00240 (M.D. Tenn.). Shakir, Robyn Shakir, and Catherine Lumas were indicted much later, in September 2014, in Case No. 3:14-cr-00142 ("2014 case"). Specifically, the grand jury charged Shakir alone with: (Count 1) engaging in a continuing criminal enterprise; (Count 2) attempting to escape from custody; (Count 3) conspiring to commit robbery and extortion affecting commerce through the use of actual and threatened violence; and (Count 4) possessing a firearm in furtherance of a crime of violence. (3:17-cv-00001, Doc. No. 42-1, at 1–7). Shakir, Robyn Shakir, and Lumas were charged in Count 5 with conspiring to distribute controlled substances. (Id. at 7–8).

As a result of negotiations between the government and Shakir's attorneys dating back to at least 2012 (see 3:17-cv-00002, Doc. No. 22-1 at 5), the government and Shakir ultimately entered a plea agreement "intended to provide the global resolution of" both the 1998 case and the 2014 case. (3:17-cv-00001, Doc. No. 42-2 at 1). The "basic terms" of the agreement were:

> (a) Defendant agrees to plead guilty to Count One in [the 2014 case]; (b) the parties agree the Court will impose a sentence of 20 years' imprisonment, to be served consecutively to all of his federal sentences in [the 1998 case]; (c) Defendant agrees to dismiss the pending appeal in [the 1998 case] and to waive his right to seek further appellate and/or post-conviction review, as set forth below; (d) the government agrees to dismiss the forfeiture allegation as well as Counts Two, Three, Four, and Five in [the 2014 case]; and (e) the government agrees to dismiss all charges in [the 2014 case] against Defendant's co-defendants, Robyn Shakir and Catherine Lumas. Appellate and other post-conviction waivers also apply as to both [the 2014 case] and [the 1998 case] as set forth below.

(3:17-cv-00001, Doc. No. 42-2 at 2). On January 4, 2016, the Court accepted Shakir's petition to plead guilty to Count 1 of the 2014 case, sentenced him to twenty years on that conviction as agreed by the parties, and dismissed Counts 2–5 of the 2014 indictment. (3:14-cr-00142, Doc. No. 101; 3:17-cv-00001, Doc. Nos. 42-3, 42-4).

Meanwhile, Shakir's appeal in the 1998 case had been stayed by the Sixth Circuit since February 25, 2015, on joint motion of the parties for the purpose of continuing settlement negotiations. (3:17-cv-00001, Doc. Nos. 43-4, 43-5). On January 4, 2016—the same day the Court accepted Shakir's plea in the 2014 case—the Sixth Circuit granted Shakir's motion to voluntarily dismiss his appeal in the 1998 case. (3:17-cv-00001, Doc. Nos. 43-6, 43-7).

On January 3, 2017, Shakir filed the pending Section 2255 Motions collaterally challenging his convictions in both cases. The Court previously dismissed six of the claims Shakir raised in those Motions on the basis that he waived them in his 2016 plea agreement. (3:17-cv-00001, Doc. Nos. 55, 56). The government responded to the remaining claims in January 2020. (3:17-cv-00001, Doc. No. 59). After a lengthy delay occasioned by the withdrawal and replacement of Shakir's attorney and the need for newly appointed counsel to absorb and investigate these complex cases for the purpose of filing a reply, Shakir's Reply was filed in December 2020. (3:17-cv-00001, Doc. Nos. 60–61, 65, 69–70). At the Court's direction, the government filed a Sur-reply on December 16, 2020. (3:17-cv-00001, Doc. No. 72). Both cases are now before the Court for a final ruling on the remaining claims.

## II.    PENDING CLAIMS

These are the remaining claims in each of Shakir's Section 2255 Motions:

1. 1998 case Claim 1 – Shakir received ineffective assistance of counsel. (3:17-cv-00001, Doc. No. 1 at 45).

2. 1998 case Claim 6 – the prosecutor committed misconduct by concealing evidence in connection with the testimony of Derrick Eatmon and Benjale Cushon. (Id. at 98).

4

3. 1998 case Claim 7 – cumulative error warrants relief. (Id. at 106).

4. 2014 case Claim 1 – the prosecutor committed misconduct by using illegal tactics to obtain a guilty plea (3:17-cv-00002, Doc. No. 1 at 33).

5. 2014 case Claim 3 – Shakir received ineffective assistance of counsel. (Id. at 39).

## III.     SECTION 2255 STANDARD

To obtain relief, a prisoner who moves to vacate or correct his sentence under Section 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the Court was without jurisdiction to impose such sentence, that the sentence was in excess of the maximum authorized by law, or that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255.  The movant "must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." Humphress v. United States, 398 F.3d 855, 858 (6th Cir. 2005) (quoting Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003)).  Non-constitutional errors are generally outside the scope of Section 2255 relief. United States v. Cofield, 233 F.3d 405, 407 (6th Cir. 2000).  A movant can prevail on a Section 2255 motion alleging non-constitutional error only by establishing a "fundamental defect which inherently results in a complete miscarriage of justice, or an error so egregious that it amounts to a violation of due process." Watson v. United States, 165 F.3d 486, 488 (6th Cir. 1999) (quoting United States v. Ferguson, 918 F.2d 627, 630 (6th Cir. 1990) (internal quotation marks and additional citation omitted)).

## IV.     ANALYSIS

### A.     Ineffective Assistance in the 1998 Case

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of Strickland v. Washington, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency

5

prejudiced the defense so as to deprive the defendant of a fair trial. Id. at 687. To meet the first prong, a movant must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" Id. at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). Prejudice, under Strickland, requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Shakir alleges that his counsel in the 1998 case were ineffective in four ways.

### 1. Failure to Raise Lack of Jurisdiction

Shakir first asserts that "multiple murders [for which he was tried] occurred outside the jurisdiction of Tennessee," and that trial counsel "fail[ed] in properly addressing this fundamental claim." (3:17-cv-00001, Doc. No. 1 at 47–48). He refers specifically to the murder of Barney Moten, for which he alleges there was no "legal jurisdiction to charge movant" in this district. (Id. at 48).

Counts 27, 28, and 29 of the Fifth Superseding Indictment against Shakir charged him with several crimes in connection with the death of Barney Moten, who was killed in Los Angeles, California. (3:17-cv-00001, Doc. No. 41-2 at 37–39). Shakir asserts that trials must be held in the county in which the offense was committed, and that trial counsel was thus

6

ineffective for failing to raise a claim that the Sixth Amendment prohibited his prosecution here for a murder in another district. (3:17-cv-00001, Doc. No. 1 at 47–48).

The claim Shakir wants counsel to have made would have been meritless.  As the government correctly points out, improper venue is not a jurisdictional defect. Williams v. United States, 582 F.2d 1039, 1041 (6th Cir. 1978) (holding that "the issue of venue is not a jurisdictional issue" but rather "a privilege granted to the accused" and that "allegations of improper venue do not raise a question of jurisdiction"); see also United States v. Mobley, 618 F.3d 539, 546 n.3 (6th Cir. 2010) ("Mobley's contention that venue is jurisdictional . . . is simply incorrect.").  And even if Shakir's claim focused on a failure to challenge venue rather than jurisdiction, that challenge would also have been meritless.  Moten's murder was alleged to have been connected to "a continuing criminal enterprise." (3:17-cv-00001, Doc. No. 41-2 at 37, 39). Although the murder itself occurred in California, the government alleged and the jury found that many overt acts in furtherance of the criminal enterprise took place in this district.  Accordingly, venue in this district was proper. United States v. Taylor, 489 F. App'x 34, 39 (6th Cir. 2012) ("For a continuing-criminal-enterprise charge, venue is proper in any district where an act that furthered the criminal enterprise took place.")

When a movant's "underlying arguments are meritless[,] it could scarcely be ineffective of . . . counsel not to raise them." Coley v. Bagley, 706 F.3d 741, 752 (6th Cir. 2013); see also United States v. Mendoza-Almendarez, No. 5:08 CR 189, 2013 WL 2443799, at *5 (N.D. Ohio June 4, 2013) (holding that petitioner "cannot establish ineffective assistance of counsel because it is not unreasonable or prejudicial for counsel to not raise meritless arguments").  Accordingly, Shakir is not entitled to relief on this claim.

7

2. Failure to Contest the Government's Case

Shakir alleges that it became apparent by the middle of the guilt phase of trial that his "attorneys were not contesting much of the government's witnesses and evidence" and that their "efforts were completely lack-luster." (3:17-cv-00001, Doc. No. 1 at 49). He asserts that counsel Patrick Berrigan had decided to focus defense efforts on the sentencing phase rather than the guilt phase and adopted a "theory of no-defense during guilt phase" that deprived Shakir of his constitutional right to a defense. (Id.)

Shakir asserts that the government's case rested on "flimsy" evidence and suggests that if defense counsel had made proper use of "[i]mpeachment evidence[,] . . . Brady material, and actual evidence of innocence," he might have been acquitted of "the bulk of the government's charges." (Id. at 49–50). But aside from the issue of the Barney Moten murder charge, which is already addressed above, Shakir does not provide many specifics about what evidence he believes should have been challenged or offered during the guilt phase. His vague allegations about a failure to "put up an adequate defense" (id. at 49) are insufficient to provide a basis for relief. Stanford v. Parker, 266 F.3d 442, 460 (6th Cir. 2001) (holding that "bald assertions and conclusory allegations" did not even merit a hearing).

The only specific topic on which Shakir claims counsel should have presented additional evidence or argument was Shakir's wealth, or lack thereof. He says the government repeatedly showed the jury photographs of his cars "to prove 'wealth,'" and that counsel refused to offer evidence that the cars were a 1987 Porsche valued at $7,500, and a 1964 Chevy Impala valued at $3,500. (Id. at 51). Despite Shakir's arguments to counsel, they advised him that the value of the vehicles was not significant to the trial. (Id.) Similarly, counsel "failed to highlight" the living

8

conditions of Shakir and his family with regard to the issue of wealth, although there were photographs in the record of his apartment and his parents' home. (Id. at 52).

But Shakir's own allegations establish that counsel discussed whether to contest the issue of his wealth at trial and made the conscious, deliberate decision not to pursue that issue. Specifically, counsel told Shakir that matters such as the value of his cars "did not mean much." (Id. at 51). Such informed "strategic choices" by counsel "are virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. Even if a different choice might appear with the benefit of hindsight to have been better, that is not a sufficient basis for finding counsel's performance objectively deficient.

Moreover, even Shakir's broader allegation—that counsel chose to focus more of their efforts on the penalty phase rather than the guilt phase—would not constitute deficient performance in the context of this case. The government argues that "[s]uch a strategy would have been particularly reasonable in this case, given that Shakir was already serving a life sentence in California, such that there was a strong incentive to avoid a death sentence, but relatively little incentive to avoid an additional sentence of incarceration." (3:17-cv-00001, Doc. No. 59 at 23). The Court agrees and observes that counsel's efforts at the sentencing phase managed to avoid a death sentence and, thus, that their strategy was effective and beneficial to their client. And finally, as the government correctly points out, Shakir's attorneys *did* highlight the prosecution's lack of physical evidence and attack the credibility of the "snitches" who testified against him, and they cross-examined witnesses at length during the guilt phase of his trial.[2] (See 3:17-cv-00001, Doc. No. 59 at 21–22 and records cited therein.)

_____

[2]    In fact, the record indicates that counsel were acutely focused before trial on the lack of physical evidence and the perceived weakness of some of the witness testimony, as evidenced by their filing a "Motion To Preclude Death Penalty Because The Government's Case On The Murder Counts In This

9

Shakir is not entitled to relief on this claim.

3. Timing of the Trial

Shakir argues that the Court **both** "trampl[ed] over [his] speedy trial rights" with a lengthy delay between the crimes, indictments, and trial **and** denied him sufficient time to prepare for trial. (3:17-cv-00001, Doc. No. 1 at 52–55). He argues that counsel "fail[ed] to preserve this claim, or to sufficiently address the matter within the trial court." (Id. at 54).

On July 14, 2006, counsel for Shakir moved to continue the date of his trial for six months, citing, among other reasons, the complexity of the case, gravity of the punishment sought by the government, 200+ potential witnesses to interview, and voluminous discovery. (3:98-cr-00038, Doc. No. 2293 at 1–2). Counsel explicitly stated that "the investigation is nowhere near complete" and that "[t]here is no way that undersigned counsel can provide effective assistance of counsel to Mr. Shakir during a trial, or even a voir dire, beginning in September, 2006." (Id. at 2). They also made the following observation:

> Jamal Shakir waived his right to a speedy trial under 18 U.S.C. § 3161 well before the trial date was set. Although Mr. Shakir is eager to have his day in court, he also recognizes the realities of the legal situation confronting him and accepts the necessity of a continuance from the September 2006 trial date.

(Id. at 3). The Court initially granted a continuance only until November 6, 2006. (3:98-cr-00038, Doc. No. 2328).

Through counsel, Shakir moved the Court to reconsider that ruling and grant a longer continuance. (3:98-cr-00038, Doc. No. 2343). Counsel reiterated the enormity of the task before them and highlighted that Shakir's life was at stake. (Id.) Counsel also again observed that "Jamal Shakir waived his right to a speedy trial under 18 U.S.C. § 3161 well before the trial date was set." (Id. at 9). The Court did reconsider its previous ruling and continued the trial until

Indictment is Based Entirely On 'Snitch' Testimony and Because the Government Has Paid Its 'Snitches' For Their Testimony." (3:98-cr-00038, Doc. No. 2476).

January 2007. (3:98-cr-00038, Doc. No. 2355). It later pushed the trial another month, to February 2007, expressly finding that the additional continuance served the ends of justice and did not constitute a miscarriage of justice, and that the need for the continuance outweighed the need for a speedy trial. (3:98-cr-00038, Doc. No. 2429). The process of selecting a jury began on February 20, 2007. (3:98-cr-00038, Doc. No. 2511).

In light of that history, Shakir's claim that his constitutional rights were violated by not going to trial more quickly is clearly frivolous. He expressly waived his right to a speedy trial, and his own attorneys made clear that they needed every bit of the time they got to prepare his defense. Moreover, the Court expressly found that delays in his trial were required by the interests of justice.

With respect to both sides of Shakir's claim—that his trial was too delayed *and* too soon—the government correctly points out that Shakir "fails to identify anything concrete or specific" that would have been done to benefit him if his trial date had been either sooner or later. (3:17-cv-00001, Doc. No. 59 at 25). Shakir alleges that "exculpatory evidence in the form of credible direct eye witnesses died prior to trial," but he does not identify those witnesses or provide any information about what their testimony would have been or how it would have benefitted him at trial. (3:17-cv-00001, Doc. No. 1 at 54). Similarly, he alleges that "witnesses who could have been investigated were denied, due to counsel being pressed to start prior to fully investigating," but he does not identify those witnesses, share anything about their potential testimony, or provide any reason to override counsel's strategic choice to seek the six-month continuance they obtained. Shakir is not entitled to relief on this claim.

11

4. Failure to Appeal and Waiver of Appeal

In this sub-claim, Shakir complains that appellate counsel was ineffective for (1) failing to raise a claim that this Court lacked jurisdiction over the prosecution of Barney Moten's murder in California, and (2) advising him that "this and other claims" that *were* raised in his appeal could be presented in a Section 2255 petition if he dropped his appeal. (3:17-cv-00001, Doc. No. 1 at 55–57). Specifically, he alleges that "[s]hould there be waiver-exhaustion-of-claims arguments put forward by the Government, and should the court find the Government's arguments to be meritorious, then it is directly due to the ineffectiveness of appellate counsel who pointedly advised Movant otherwise." (Id. at 56).

For the reasons already explained above, any appellate claim about the Moten charges would have been meritless, and counsel's omission of the claim from Shakir's appeal cannot be deemed objectively deficient. See Bennett v. Brewer, 940 F.3d 279, 286 (6th Cir. 2019), cert. denied, 140 S. Ct. 2534 (2020) (noting that "failure to raise a meritless claim is not ineffective assistance"); Mapes v. Coyle, 171 F.3d 408, 427 (6th Cir. 1999) ("Counsel could not be unconstitutionally ineffective for failing to raise these meritless arguments."). Accordingly, Shakir's claim that counsel was ineffective for failing to raise that claim fails on its merits.

Furthermore, the government acknowledges that ineffective-assistance claims are an exception to the requirement that Section 2255 claims must be exhausted at trial and on direct appeal, and it does not assert (and the Court has not found) that any of Shakir's ineffective-assistance claims were waived or defaulted. (See 3:17-cv-00001, Doc. No. 59 at 14–25). Accordingly, Shakir's allegation of ineffectiveness with regard to appellate counsel's advice about what claims could still be brought in a Section 2255 petition after dropping his appeal is moot with respect to this or any other ineffective-assistance claim.

12

To the extent Shakir's allegation is intended to raise a broader claim blaming appellate counsel's advice for the waiver of any other issues, the Court has already considered that argument in its previous Memorandum Opinion. (3:17-cv-00001, Doc. No. 55 at 10–21). There, the Court found that even if appellate counsel's advice to Shakir had been deficient, Shakir could not demonstrate any prejudice arising from the deficiency. The Court adopts that ruling and its reasoning here:

> [E]ven assuming deficient performance by O'Brien, Shakir cannot demonstrate any prejudice arising from counsel's bad advice. The Sixth Circuit found a plea agreement enforceable in a case in which there was even stronger evidence that counsel had given the petitioner inaccurate advice about the consequences of the plea. Ramos v. Rogers, 170 F.3d 560 (6th Cir. 1999). Specifically, plea counsel in Ramos testified at a post-conviction hearing that he had mistakenly believed that the petitioner would be eligible for a certain type of probation and had "promised" the petitioner that he would be granted such probation after one year if he pleaded guilty, and both counsel and the petitioner averred that the petitioner's agreement to plead guilty was based on that assurance. Id. at 562–63. Despite finding the petitioner's claim "very troubling," the Sixth Circuit held that the "trial court's proper colloquy can be said to have cured any misunderstanding [the petitioner] may have had about the consequences of his plea." Id. at 565, 566. The court summarized the relevant portion of the petitioner's colloquy as follows:
>
> > [The trial judge] asked [the petitioner], "Do you understand that [rape] is not a probationable offense, that you are not going to receive probation under any circumstances?" [The petitioner] replied, "Yes, Your Honor." The judge asked if any promises had been made to the petitioner in order to get him to plead; [the petitioner] answered, "No."
>
> Id. at 564. The Sixth Circuit determined that, through that exchange, the trial court had "specifically informed the defendant that his counsel's advice was incorrect," id. at 565, and that the petitioner's claim that he pleaded guilty based on counsel's faulty advice could not establish prejudice in those circumstances:
>
> > In other words, [the petitioner] wants us to rely on his alleged subjective impression of what the plea bargain was, rather than the bargain actually outlined in the record. The record in the case indicates that [the petitioner] responded negatively (and, he wants us to believe, untruthfully) to a judge's inquiry as to whether any promises had been made to him in order to get him to so plead.
> >
> > If we were to rely on [the petitioner's] alleged subjective impression rather than the record, we would be rendering the plea colloquy process meaningless, for any convict who alleges that he

13

believed the plea bargain was different from that outlined in the record could withdraw his plea, despite his own statements during the plea colloquy (which he now argues were untruthful) indicating the opposite. This we will not do, for the plea colloquy process exists in part to prevent petitioners . . . from making the precise claim that is today before us. "[W]here the court has scrupulously followed the required procedure, the defendant is bound by his statements in response to that court's inquiry."

Id. at 566 (emphasis in original; citation omitted); see also United States v. Pola, 703 F. App'x 414, 423 (6th Cir. 2017) ("The plea hearing colloquy also reveals that Pola understood, notwithstanding his attorney's questionable advice [about the terms of the agreement]. When an ineffective-assistance claim is based on misleading information regarding the consequences of a plea, a proper plea colloquy is generally deemed to cure any misunderstanding the defendant may have had about the consequences of the plea.")

The rationale of Ramos is especially applicable where the term of a plea agreement about which a petitioner claims to have been misled by counsel is "unambiguous on its face." McAdoo v. Elo, 365 F.3d 487, 497 (6th Cir. 2004). In McAdoo, the petitioner claimed that, based on advice from counsel, he believed that the concurrent life sentences he accepted in his plea agreement were actually twenty-year sentences. Id. at 496. The Sixth Circuit rejected that argument:

[A]s in Ramos, we hold that a term that is unambiguous on its face and agreed to by the defendant in open court will be enforced. We note that the term "life sentence" is not ambiguous. The United States Constitution does not require judges to explain the meaning of "life sentence" and other unambiguous terms during the plea colloquy in order to combat alleged misinformation that is not revealed on the record. McAdoo acknowledged in court under oath that he was agreeing to a life sentence, and the evidence and his unsworn statement presented to the state court failed to show that he reasonably believed he was actually agreeing to a maximum sentence of only twenty years.

Id. at 497 (internal citations omitted).

Although these cases involved ineffective assistance with regard to other provisions of a plea agreement, the rule espoused by Ramos—that a proper plea colloquy forecloses any claim of prejudice from counsel's deficient advice—applies equally to allegations of ineffective assistance concerning waiver provisions. See Dempsey v. United States, No. 1:14-cv-01349, 2018 WL 1189876, at *4 (E.D. Tenn. Mar. 7, 2018) (finding any misunderstanding about the scope of plea agreement waiver was cured during colloquy); United States v. McKnight, No. 15-cv-13232, 2016 WL 3087702, at *2–3 (E.D. Mich. June 2, 2016) (same). And again, this is especially true when the "point of alleged confusion" about the meaning of a waiver is addressed in "plain English" in the plea agreement:

> Although Defendant might not have known exactly what the statutory citation of § 2255 meant, he, at the very least, knew that it was a 'post-conviction proceeding' that 'contest[s] his conviction.' Plea Agreement at 10. The claims that Defendant seeks to raise in his motion . . . are foreclosed by these simple statements.

McKnight, 2016 WL 3087702, at *3 (emphasis in original). Accordingly, a defendant's alleged confusion about clear text is outweighed by his testifying that he understands the text during his plea colloquy:

> Second, and more importantly, Defendant's on-the-record assertions, made under oath, flatly belied this type of purported confusion. Because Defendant argues that "28 U.S.C. § 2255" was confusing on its face, the nature of Defendant's purported confusion is such that he would have had questions upon reading the plea agreement in the first instance. He was given several opportunities to ask questions about the terms of the plea agreement, including the meaning of § 2255, but he repeatedly asserted that he understood everything in it. A trial court's proper plea colloquy cures any misunderstandings that a defendant may have about the consequences of a plea. Ramos v. Rogers, 170 F.3d 560, 565 (6th Cir. 1999); see also Boyd v. Yukins, 99 F. App'x. 699, 703 (6th Cir. 2004). Accordingly, on these facts and as the claim is articulated by Defendant, he cannot now take back his assertion that the waiver was knowing and intelligent.

McKnight, 2016 WL 3087702, at *3 (citations to the record omitted).

The facts of this case are materially similar to those of the cases discussed above. As in Ramos, there is some evidence that Shakir was poorly advised by counsel about the scope of the waivers in the plea agreement. But as in McAdoo and McKnight, the language in question is crystal clear. And in . . . Shakir's plea colloquy . . . the Court clearly spelled out the appellate waivers in his agreement and the limited exceptions to them and asked if Shakir understood them. He said unequivocally that he did. [FN2 Significantly, he did so just minutes after voicing confusion about a different section of the agreement, dispelling any theory that he felt somehow constrained to simply agree with everything the Court articulated.] Pursuant to Ramos, this exchange "foreclosed" any argument that Shakir was relying to his detriment on advice that was contrary to what was plain from the record and the text of the plea agreement. Pola, 703 F. App'x at 423 ("The court's proper advisement of rights is thus deemed to "foreclose" any showing of actual prejudice attributed to counsel's erroneous advice, because the defendant is deemed bound by his statements in response to the court's inquiry. Otherwise, the plea colloquy process would be rendered meaningless if a defendant could reopen the record by later asserting that actually, he misunderstood.") (citing Ramos).

Even if the Court were to delve further into the issue of prejudice, the exchange of letters on which Shakir relies undercuts his claim of prejudice in several ways. First, the letters demonstrate that the plea agreement and the waivers in particular

were the subject of multiple discussions between Shakir and his counsel in person, by phone, and by letter. This negatively highlights Shakir's reliance on the limited sampling of advice from one of three attorneys who were advising him about the plea agreement. The Government correctly observes that the affidavit offered by Shakir of Jason Gichner, who represented Shakir in the 2014 case and acknowledges having "reviewed the plea agreement" with him, is curiously silent regarding the advice Gichner gave him about the enforceability of appellate waivers. (3:17-cv-00001, Doc. No 53 at 8–9; Doc. No. 49-1.) Gichner testifies that he deferred to O'Brien and Hall "on the effect this plea would have" on the 1998 case, but the appellate waivers applied to both cases. (Id., Doc. No. 49-1 at 1.) Shakir has not offered affidavits from O'Brien or Hall about the totality of their advice about the waivers, or provided any affidavit of his own to the effect that he believed, based on advice from counsel, that the waivers were unenforceable. [FN3 Shakir has not requested an evidentiary hearing on the threshold question of ineffective assistance with regard to the validity of his waivers. (See 3:17-cv-00001, Doc. No. 49 at 16 (asking the Court to find that he has not waived any issues and to "thereafter hold an evidentiary hearing on the merits" of his claims).) Regardless, the Court would not find a hearing to present testimony about counsel's performance warranted because it is clear from the record that Shakir cannot establish prejudice from that performance.] To the contrary, Shakir's contemporaneous letters indicate that he was well aware and intently focused on the fact that the plain language of the plea agreement was contrary to any suggestion that he was not waiving his right to challenge his convictions or sentences.

It is also evident from the letters that Shakir's position about what was acceptable to him in a plea agreement changed significantly between the time of that correspondence and his signing of the plea agreement. For example, in one of his letters to counsel, Shakir wrote that he had "thought long and hard" about which count of the 2014 indictment he was "willing to plea to," and that "the C.C.E. is not satisfactory," so "it will have to be either the Hobbs Act Robbery, or the drug conspiracy." (3:17-cv-00002, Doc. No. 31-1 at 9.) And yet he ultimately agreed to plead guilty and did plead guilty to Count One: conspiracy and attempt to engage in a Continuing Criminal Enterprise, the very count he had insisted was "not satisfactory." (3:17-cv-00001, Doc. No. 42-2 at 3; Doc No. 42-3 at 1; Doc. No. 42-4 at 49–51.) Accordingly, the fact that Shakir was initially opposed to waiving Section 2255 claims while the plea agreement was being negotiated does not prove that his later agreement to the waivers was unknowing or involuntary. He might simply have changed his mind and acquiesced to the waivers for the same reason he agreed to plead guilty to the continuing-criminal-enterprise count: it was the only way to get the deal. (See 3:17-cv-00002, Doc. No. 22-1 at 30–31 (reflecting the government's insistence that Shakir plead guilty to "the CCE count").)

The fact that Shakir simply changed his mind is also supported by another letter he wrote while his plea agreement was being negotiated. On October 20, 2015, Shakir wrote to Tennessee Attorney General Herbert Slatery to complain about what he characterized as AUSA Koshy's misconduct in using other people as

"leverage" in a "last ditch attempt at depriving [Shakir] of [his] constitutional rights," including forcing him to drop his appeal of the 1998 case. (3:17-cv-00001, Doc. No. 29-1 at 4.) He equated the government's efforts to "force [him] to forfeit [his] appeal rights" with "extortion and kidnap for ransom," and wrote that he did "not in any way want to forfeit [his] constitutional rights to an appeal on the original case, or trial on the current case," but that he was "between a rock and a hard place." (Id. at 5.) He wrote that the Attorney General was "the last hope to correct what is happening before [he had] to involuntarily sign [his] life and rights away because [he had] no other recourse to save [his] family." (Id. at 6.) But despite those misgivings, Shakir ultimately did forfeit his right to trial in the 2014 case, and changed his mind about the count to which he was willing to plead guilty. The most plausible interpretation of the record is that Shakir also changed his mind about the waivers in the face of the pressure he describes.

Accordingly, Shakir cannot demonstrate prejudice as required by Strickland and fails to carry his burden of demonstrating that his waivers are invalid due to ineffective assistance of counsel.

(Id. at 15–21.)

Accordingly, any claim that appellate counsel was ineffective in the advice he gave Shakir about the meaning of his waivers fails on the prejudice prong of Strickland, and Shakir is not entitled to relief on this claim.

## B. Prosecutorial Misconduct in the 1998 Case

Shakir alleges that the prosecution committed misconduct and withheld material evidence favorable to the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963). (3:17-cv-00001, Doc. No. 1 at 98–106.) First, he asserts a "multi-layered" violation with regard to the testimony of Derrick Eatmon. (Id. at 98–102.) Second, he alleges "[t]he same tactics were employed with government witness Benjale Cushon." (Id. at 102–06.)

### 1. Eatmon Claims

#### a. Limitation on Cross-Examination

Shakir first claims that the prosecution acted inappropriately by arguing that Eatmon's Fifth Amendment rights precluded any examination of him about the murder of Deshay Crutcher, which Eatmon had admitted in a recorded call, but for which he had not been charged

or granted any immunity. (Id. at 98). The government argues that, to the extent this allegation can even be characterized as one of prosecutorial misconduct, it was raised in his direct appeal and subsequently waived in his plea agreement. (3:17-cv-00001, Doc. No. 59 at 26). Shakir did raise this claim in his direct appeal from his conviction in the 1998 case, albeit in a footnote. (3:17-cv-00001, Doc. No. 43-1 at 53–54 n.3). Accordingly, his plea agreement waiver of "any claim of prosecutorial misconduct that was previously raised in his direct appeal" (3:17-cv-00001, Doc. No. 42-2 at 27) affirmatively waived this portion of his claim.

Alternatively, the government responds that it was Eatmon who moved, through his own attorney, to preclude examination about the Crutcher murder. (3:17-cv-00001, Doc. No. 59 at 25–26). The government is correct again. The transcript of Shakir's trial confirms that it was Eatmon's attorney, Joseph Lackey, who appeared in court and "respectfully ask[ed] the Court to limit any questions and not allow any questions of my client with regard to" the Crutcher murder. (3:98-cr-00038, Doc. No. 2891 at 48). Shakir, through counsel, opposed that motion in court and in a written response. (Id. at 49; 3:98-cv-00038, Doc. No. 2889 at 1). The prosecutor did express "several concerns," including the admissibility of such evidence as character evidence under the Federal Rules of Evidence, and explained that Eatmon's plea agreement "provides absolutely no protection to Mr. Eatmon" from local prosecution for Crutcher's murder. (3:98-cr-00038, Doc. No. 2897 at 4–6, 9). But Eatmon's attorney expressly asserted that Eatmon had a Fifth Amendment right not to answer any questions about Crutcher's murder, which was the ultimate basis for the Court's decision to preclude that line of questioning. (Id. at 11–12, 14; 3:98-cr-00038, Doc. No. 2930). And it was on the advice of his attorney during the jury-out examination that Eatmon invoked his Fifth Amendment rights to refuse to answer questions about Crutcher's murder. (3:98-cr-00038, Doc. No. 2897 at 24–25). Eatmon also confirmed that

18

the government had not promised, and he had no expectation, that the government would protect or help him in any way in connection with the state authorities' investigation of him for the Crutcher murder, although Eatmon hoped it might. (Id. at 28–30). Accordingly, even if prosecution had made improper comments about Eatmon's testimony, those comments did not prejudice Shakir because it was Eatmon's own motion and assertion of his Fifth Amendment rights that led the Court to limit his cross-examination.

But Shakir also fails to establish that the prosecutor's comments *were* improper. He alleges that the prosecutor "was fully aware and certain that Mr. Eatmon was not going to be charged in the murder of Mr. Crutcher." (3:17-cv-00001, Doc. No. 1 at 99). Eatmon's attorney, however, corroborated the prosecutor's understanding that the local district attorney still had the case open and had not made any decision not to charge Eatmon for the murder. (3:98-cr-00038, Doc. No. 2897 at 7–9, 11–12). In fact, Eatmon and his attorney had engaged in a discussion about the possibility of a plea agreement regarding the Crutcher murder approximately eighteen months earlier. (Id. at 11–12). The trial judge heard from counsel for all three parties on the issue and determined that the risk of prosecution made Eatmon's invocation of his Fifth Amendment rights permissible. Shakir's conclusory allegation that everyone knew there would be no prosecution is not sufficient to support his claim or warrant further development. Accordingly, even if his claim related to the limitation of Eatmon's testimony were not waived, it would fail on its merits.

Shakir asserts that the prosecution also failed to disclose additional evidence— specifically, information from Bobby Scales—that Eatmon had killed Crutcher. (3:17-cv-00001, Doc. No. 1 at 99). In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due

19

process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The Supreme Court has articulated three components of a Brady violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999).

The arguments at trial surrounding the limitations on Eatmon's testimony, including the jury-out examinations of Eatmon, made clear that Shakir's defense team was aware of both the recorded confession in the call from Eatmon to his brother and Bobby Scales's statement implicating Eatmon in the Crutcher murder. (3:98-cr-00038, Doc. No. 2891 at 47, 49; 3:98-cr-00038, Doc. No. 2897 at 13–14, 25, 28). "There is no Brady violation 'where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source.'" Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998) (quoting United States v. Clark, 928 F.2d 733, 738 (6th Cir. 1991)). Accordingly, any claim of a Brady violation in connection with the Crutcher murder fails on the merits.

### b. Eatmon's Deal and Recantation

Shakir alleges that the prosecutor gave Eatmon a deal for a ten-year sentence in exchange for false testimony against Shakir and had Eatmon lie on the witness stand to the effect that he did not have such a deal. (Id. at 100–02). But again, the record proves otherwise. During Eatmon's testimony, the prosecutor entered his plea agreement into evidence and questioned him about it at length. (3:98-cr-00038, Doc. No. 2892 at 27–38). Specifically, the prosecutor elicited testimony from Eatmon that the government had offered to move for a downward departure from

Eatmon's expected sentence range and recommend a sentence of ten years in exchange for his cooperation. (Id. at 34–35). Eatmon also agreed, however, that the judge had the authority to decide his sentence regardless of what the government recommended. (Id. at 34).

Shakir alleges that this "was a complete and utter lie." (3:17-cv-00001, Doc. No. 1 at 100). He asserts that a contemporaneous pro se motion Eatmon filed indicated his belief that he was guaranteed a ten-year sentence. (Id.) But Shakir's attorney cross-examined Eatmon with that motion, and the jury was tasked with assessing Eatmon's credibility about his expectations from his plea deal. (3:98-cr-00038, Doc. No. 2898 at 26–29). Moreover, it is simply the law, as set forth in Eatmon's plea agreement, that "the decision to depart based upon cooperation from the U.S.S.G. recommended sentencing range, and the extent of such departure rests solely with the Court," and that "the Court is neither a party to, nor bound by this Plea Agreement and, after consideration of the Sentencing Guidelines, may impose the maximum penalties." (3:98-cr-00038, Doc. No. 2002-1 at 16–17). The government's compliance with its agreement to recommend a ten-year sentence for Eatmon and the Court acceptance of the recommendation are not unusual or suspicious in any way.

Shakir relies on a 2018 affidavit from Eatmon in which Eatmon says that he was "promised a ten year sentence as a part of the plea agreement," but that the prosecutor told him not to testify about the ten-year sentence deal because "we don't want the jury to know that you will only get ten years after being involved in two murders." (3:17-cv-00001, Doc. No. 23-1). That testimony is simply not worthy of any credit because the prosecutor himself elicited Eatmon's testimony at trial about the agreement to recommend a ten-year sentence and entered the plea agreement itself into evidence. In fact, the prosecutor asked Eatmon to assume "the judge takes the government's recommendation and gives you ten years" for the purpose of

discussing what would happen after he was released from prison. (3:98-cr-00038, Doc. No. 2892 at 35). Furthermore, the records in Eatmon's own case demonstrate that he was fully aware that his final sentence was up to the Court:

> And if Sunny Koshy need me, he know I am a man of my word because of what I did to Donut [meaning Shakir]. You know, it wasn't for no K51 [sic] or no Rule 35. I did that because I was guilty in God's eyes for what I did. Like I told Joe Lackey, if it's left up to you to give me 35, 40, 50 years, that is what I am going to have to do, you know, because you see if it's justice.

(3:98-cr-00038, Doc. No. 3415 at 13–14). Accordingly, there is no credible basis for finding that the prosecution instructed Eatmon to lie about the terms of his plea agreement. Moreover, there is no substantial likelihood that the difference from the jury's perspective between a guaranteed ten-year sentence and a recommendation for a ten-year sentence was significant enough, in the context of his otherwise facing up to life in prison (see 3:98-cr-00038, Doc. No. 2002 at 2; 3:98-cr-00038, Doc. No. 2002-1 at 2) to alter their view of Eatmon's credibility at trial.

Shakir also seems to assert that the government intentionally procured false testimony from Eatmon about the facts of the case. He relies again on Eatmon's 2018 affidavit, in which Eatmon recants his trial testimony about the Chambers murder's having been carried out on Shakir's instruction. At the outset, the Court observes that the affidavit says that Eatmon was pressured to cooperate with the government and that his eventual testimony about the murder of Richard Chambers was false, but it never actually says that the prosecutor knew the testimony about the Chambers murder (as opposed to testimony about Eatmon's deal, which has already been addressed above) was false. (3:17-cv-00001, Doc. No. 23-1). Accordingly, it does not support a claim of prosecutorial misconduct as alleged in Claim 6 of the Petition. Nevertheless, out of an abundance of caution, the Court considers whether Eatmon's ostensible recantation of his testimony warrants relief.

The Sixth Circuit instructs that a recanting government witness only warrants a new trial if:

> (1) the court is reasonably well satisfied that the trial testimony given by the material witness is false;
>
> (2) without the false testimony, the jury might have reached a different conclusion; and
>
> (3) the party seeking the new trial was taken by surprise when the false testimony was given, and was unable to meet it or did not know of its falsity until after the trial.

United States v. Willis, 257 F.3d 636, 642–43 (6th Cir. 2001) (citing Gordon v. United States, 178 F.2d 896, 900 (6th Cir. 1949)).  The "first test" in such circumstances "is whether the court is reasonably well satisfied that the prior testimony was false." United States v. Chambers, 944 F.2d 1253, 1264 (6th Cir. 1991), superseded in part on other grounds by U.S.S.G. § 2D1.5(a) (quoting United States v. Kearney, 682 F.2d 214, 229 (D.C. Cir. 1982)).  Generally, "[r]ecanting affidavits and witnesses are viewed with extreme suspicion," and "[i]f that first and primary ground is not satisfied, the primary ground for granting the new trial is lacking." Id.  Moreover, "caution is clearly warranted" where "[t]here is no evidence concerning the authenticity of the [recanting] affidavit, the motivation of the affiant, the circumstances of the affidavit's execution, the timing of its submission, or its consistency with other evidence in the trial record." Giles v. Wolfenbarger, 239 F. App'x 145, 147–48 (6th Cir. 2007).  When a court applying this test "firmly believes" that the recanting witness testified truthfully at trial, "there is no need for an evidentiary hearing." Corona v. United States, No. 3:05-CR-148, 2018 WL 283252, at *2–3 (E.D. Tenn. Jan. 3, 2018).

The Court has already found above that the statements in Eatmon's affidavit about being instructed not to acknowledge the ten-year sentence provision in his plea agreement are clearly untrue.  That conclusion only heightens the inherent suspicion of the rest of the affidavit.  Further

23

adding to the Court's skepticism about the affidavit is the lack of information about how the affidavit came to be drafted and by whom, what communication took place between Shakir and Eatmon about the affidavit, and why Eatmon chose to recant his testimony so many years after trial.

As the government correctly suggests, Shakir's intervening conviction for conspiring to retaliate against witnesses who testified against him is a plausible motive for Eatmon to falsely recant his trial testimony. (See 3:17-cv-00001, Doc. No. 59 at 29). In fact, Shakir admitted in his Plea Agreement in the 2014 case that he had sought to have witnesses in the trial of the 1998 case killed. (3:17-cv-00001, Doc. No. 42-2 at 7). The government incorporated into that Agreement a page of Shakir's own handwriting, in which he instructed an associate as follows:

> Then tell them to get with F'loc and see if he got the information on Chip, Kenneth, Popa, or Rambo. if [sic] F'loc got that info for me, I want one of those n****s heads – especially Kenneth.

(Id. at 11). Shakir admitted that

> All four of these people . . . had provided significant information in the investigation leading to Shakir's trial in [the 1998 case], and three of them had actually testified at trial. Killing these witnesses would have retaliated against them for their past cooperation with law enforcement and set an example that Shakir would not tolerate such conduct in the continuing criminal enterprise he was attempting and conspiring to conduct. Shakir recruited Akin Floyd to locate these witnesses and offered to provide him substantial amounts of drugs and to introduce Floyd to California-based drug distributors if these people were murdered. Shakir had also provided other hit lists to other people, which targeted other witnesses from his previous federal trial, for the same reasons.

(Id. at 15–16). Although the Plea Agreement did not provide the full proper names of the intended victims of witness retaliation, Eatmon testified at trial that he goes by the nickname "Chip." (3:98-cr-00038, Doc. No. 2892 at 3).

Additionally, at one of Eatmon's hearings in his own case, he and his attorney expressed some fear on his part that he might be retaliated against for his testimony. (3:98-cr-00038, Doc.

24

No. 3415 at 4–5 (counsel's statement to the Court that "[h]e actually fears for his safety if he has to go to a halfway house"), 13 (Eatmon's worry about "going back to California and people knowing all what I done did and they going to put me up in a half-way house where anybody could come and wait and watch and do something to me")). That well-founded fear would be a powerful motive for Eatmon to sign any recantation Shakir had delivered to him.

The records in this case also establish that Eatmon has a history of mental illness including visual and auditory hallucinations (3:98-cr-00038, Doc. No. 2892 at 7, 12–13), and that he has "mood swings and stuff" and goes "all crazy" when he does not take his medication (id. at 15–16); in fact, he was found incompetent for legal proceedings in his own case at one point. (Id. at 21). But there is nothing in the affidavit about his current condition or treatment status or how that might affect his truthfulness or his memory of the events in question.

Furthermore, although the trial judge who presided over Shakir's trial retired years ago and has since passed away, the Court has reviewed Eatmon's trial testimony in full. Over the course of hours of testimony spanning two days of trial, Eatmon testified to drug trafficking involving (among others) himself, Shakir, Richard Chambers (known to Eatmon as "Pops"), and Disco.[3] (3:98-cr-00038, Doc. No. 2892 at 24, 48–49). He testified that Disco began complaining that Chambers was getting high and might start to talk about their business and get them robbed, so Eatmon spoke by phone to Shakir (whom Eatmon called "Nut") about the issue. (Id. at 50–52). Eatmon specifically recalled that the conversation took place when he was outside his house in Nashville. (Id. at 51). Disco got on the phone, and Eatmon heard him tell Shakir that he was "going to do Pop," meaning to kill him. (Id. at 50–51). Eatmon got back on the phone and told Shakir that Shakir should "[d]o it on [his] end," because Eatmon did not "want to run Nashville

---

[3]     The record indicates that Disco's real name was Torrance Lavell Cook (3:98-cr-00038, Doc. No. 2898 at 55–56), but he was only called Disco throughout Eatmon's testimony.

25

hot" and thought the plan to kill Chambers in Nashville was "stupid." (Id.)  But Shakir told Eatmon to "just let Disco handle his business." (Id. at 50).  So Disco went to get Chambers and brought him back to Eatmon's house in a red rental car that had been rented by an acquaintance of Disco's named Annette, and they all got back in the car with Eatmon driving. (Id. at 50, 52–53).  Eatmon did not know how long or far he drove, but at some point, Disco instructed him from the back seat to turn onto a dirt road and told Chambers, who was in the front passenger seat, to get out and change seats with him. (Id. at 53–54).  When Disco and Chambers got out of the car, "Disco started just shooting" and "just shot until he – until they was all gone" while Eatmon stayed in the driver's seat. (Id. at 54–55).  Then Disco got back in the car, and Eatmon drove back to his home, stopping along the way for Disco to throw his gun off a bridge and into some water. (Id. at 55).  Soon thereafter, Eatmon, Disco, Shakir and others drove to Memphis with $360,000 of drug money. (Id. at 56–57).

Eatmon testified that Chambers begged for his life during the drive and that Eatmon "wasn't feeling right" after the murder "because it was a wrong killing" for which he "didn't see no reason," but that he participated "for the money." (Id. at 54, 56).  He testified that Shakir was also known to him as "Boss," because "he was running his show." (3:98-cr-00038, Doc. No. 2893 at 7).  He went on to describe his further associations with Shakir, including specific events, the drug trade and money involved, and identified several members of Shakir's organization through photographs. (See generally 3:98-cr-00038, Doc. No. 2893).  Much of the testimony he gave was corroborated by other evidence, including photographs, property records, and police records. (Id.)  He also acknowledged having lied to the government in his first meeting with them about his involvement. (Id. at 28).

On cross-examination by Shakir's attorney, Eatmon expressed some confusion about the details of his criminal record but acknowledged on the topic of prior felonies that he "had so many, [he] can't remember." (3:98-cr-00038, Doc. No. 2897 at 52). He reiterated that Shakir was "boss, because he was calling the shots over – over Disco" and others. (Id. at 59). And he admitted that his brother, whom he had tried to shield with his own body from being shot during an altercation with Shakir and Disco, had later shot and killed Disco. (Id. at 78, 80). Eatmon acknowledged that Disco and Chambers did not like each other. (Id. at 85–86). He described the events surrounding Chambers's murder consistently with how he described them on direct examination. (Id. at 86–91).

Shakir's counsel tried to impeach Eatmon with questions about whether he had given conflicting accounts of the murder to Bobby Scales and a Mr. Kessee, but Eatmon denied ever having those conversations. (Id. at 92–94.) He also admitted again to having lied to the prosecutor about having no involvement in the Chambers murder the first time they met. (Id. at 95). Shakir's counsel challenged Eatmon's testimony that he had cooperated with mental health professions during his assessments with records indicating that he had been uncooperative. (3:98-cr-00038, Doc. No. 2898 at 4–5, 8–9). It was also established on cross-examination that Eatmon had been diagnosed with antisocial personality disorder in addition to schizophrenia, and he acknowledged that he had behavioral problems during and after school and had a history of problems with authority, criminal behavior, the use of aliases, and fighting. (Id. at 10–15). Eatmon denied that another inmate convinced him to plead guilty. (Id. at 20-21). Finally, Eatmon confirmed on cross-examination that he was aware that his ultimate sentence was up to the judge and denied having drafted a pro se motion he signed that referenced a ten-year sentence; he testified the motion was "probably" drafted by a jailhouse lawyer. (Id. at 24–29).

Specifically, the motion stated in pertinent part that "[t]he Honorable Judge John Nixon stated in March of 2006 that if the prosecutor hasn't started the trial by September of 2006, then the defendant will be final sentenced for ten years."[4] (Id. at 26–27).

On re-direct examination, Eatmon testified that he called Shakir "Boss" because Shakir was "Boss over his neighborhood," but stated that Shakir was not *his* boss: "No, not my boss. I just called him Boss." (Id. at 34–35). Eatmon also testified that he had only had one argument with Shakir, in the context of the day Eatmon was trying to shield and protect his brother. (Id. at 39–40). On re-cross, he acknowledged that on that day when he and his brother went looking for Shakir and Disco, his intention was to shoot them if he found them. (Id.)

The Court finds Eatmon's trial testimony to be credible. He was too easily confused and occasionally vague to have been coached. And if the prosecution had fed Eatmon a false story to incriminate Shakir, it surely would have included more express instructions from Shakir than to let Disco "handle his business," and it would not have included any statement that Shakir was not Eatmon's "boss."[5] Even the acknowledgment that Disco had been complaining about Chambers and wanted to "do" him before the phone call with Shakir made Eatmon's testimony less than perfectly ideal for the government. Nonetheless, the testimony about Chambers's murder was plausible and consistent throughout Eatmon's direct and cross-examinations. Eatmon and Shakir are the only people still alive who know first-hand the truth of whether Disco killed Chambers at Shakir's instruction. But other details of Eatmon's version of events were

---

[4]     Shakir appears to believe that this pro se motion supports his claim that Eatmon had a secret guarantee of a ten-year sentence from the government. (See 3:17-cv-00001 at 100–01). But regardless of whether Eatmon actually drafted the motion, it references a statement by the Court, not a secret promise from the prosecutor.

[5]     During motion arguments following Eatmon's testimony, counsel for Shakir characterized this response by Eatmon—that Shakir was not his boss—as "fortunate[]" for Shakir. (Id. at 48). The prosecutor acknowledged that was "[a]bsolutely not" a response the government wanted. (Id. at 53).

corroborated by, for example, Annette Gooch, who testified that, during some time period she could not clearly specify, she had a rental car that Disco borrowed overnight without her permission. (3:98-cr-00038, Doc. No. 2898 at 60). When he returned the car the next day, a small handgun she had in the glove compartment was missing. (Id. at 62–63).

In comparison, the Eatmon affidavit on which Shakir relies has many indicia of being unreliable. As the Court observed above, there is nothing explaining the background or process of how or where the affidavit came to be drafted, signed, or delivered to Shakir, and it does not address reasonable concerns about the affiant's mental condition. The document is not notarized, and the witness signature is illegible. (3:17-cv-00001, Doc. No. 23-1 at 4). And it uses words and phrases that Eatmon's trial testimony would suggest he does not have the vocabulary or language skills to draft. Eatmon testified that he had attended school until "12" and was "[n]ot that good" at reading or writing, and that he had to rely on his attorney's explanations to understand his plea agreement. (3:98-cr-00038, Doc. No. 2892 at 4, 28). His limitations were demonstrated at trial when, for example, Eatmon did not fully understand his mental health diagnoses, did not understand what an arraignment was despite having a lengthy criminal history, did not understand what it meant to "broker" a drug deal, and was generally easily confused and unable to follow complex questions. (3:98-cr-00038, Doc. No. 2892 at 22; 3:98-cr-00038, Doc. No. 2897 at 66, 82; 3:98-cr-00038, Doc. No. 2898 at 22.) With that perspective, the references in the affidavit to a "motion to sever," "instructions to persuade me," a "critical period," having "felt that [he] was out of options," "subsequent plea negotiations," and the fact that a ten-year sentence "equated to time served" seem very unlikely to have originated with Eatmon. (3:17-cv-00001, Doc. No. 23-1 at 2).

For all these reasons, the Court is not at all satisfied that Eatmon's trial testimony was false and is, to the contrary, quite convinced that Eatmon's recanting affidavit is not worthy of credit. Shakir's claim thus fails to satisfy the "first and primary ground" for relief, United States v. Chambers, 944 F.2d 1253, 1264 (6th Cir. 1991), and in light of the Court's firm belief in the truthfulness of Eatmon's trial testimony, no hearing on this claim is warranted. Corona v. United States, No. 3:05-CR-148, 2018 WL 283252, at *2–3 (E.D. Tenn. Jan. 3, 2018).

2. Cushon Claim

Shakir alleges that "[t]he same tactics were employed with government witness Benjale Cushon." (3:17-cv-00001, Doc. No. 1 at 102). Specifically, he asserts that in exchange for his cooperation and testimony against Shakir, Cushon was given substantial benefits that the prosecutor hid from the defense, the Court, and the jury through "his usual under-handed tactics and a play on words." (Id. at 103). But the government correctly points out that Shakir made this prosecutorial misconduct claim about Cushon at some length in his appellate brief. (3:17-cv-00001, Doc. No. 59 at 31; see 3:17-cv-00001, Doc. No. 43-1 at 48–57). This claim was thus clearly waived by the express terms of Shakir's subsequent global plea agreement. (3:17-cv-00001, Doc. No. 42-2 at 27 (waiving "any claim of prosecutorial misconduct that was previously raised in his direct appeal)). And, unlike the Eatmon claim above, the express waiver of the Cushon claim is not debatable, and Shakir does not rely on any new evidence in support of it. Accordingly, no further analysis is needed, and Shakir is not entitled to relief on this claim.

C. **Cumulative Error in the 1998 Case**

Shakir next asserts that he was denied a fair trial due to the effect of cumulative error in the 1998 case. (3:17-cv-00001, Doc. No. 1 at 106–08). There are some courts that hold that "relief under § 2255 is not available on a claim of cumulative error." United States v. Watson,

No. 1:15-CR-113, 2020 WL 3071788, at *5 (S.D. Ohio June 10, 2020) (citing <u>Moreland v.</u> <u>Bradshaw</u>, 699 F.3d 908, 931 (6th Cir. 2012)). But even assuming that such a claim is viable in the abstract, it fails where "there are simply no errors to cumulate." <u>Getsy v. Mitchell</u>, 495 F.3d 295, 317 (6th Cir. 2007). The Court found above that Shakir has failed to demonstrate any constitutional violations or other errors at the trial of his 1998 case. Accordingly, he is not entitled to relief on this claim.

## D. Prosecutorial Misconduct in the 2014 Case

Shakir claims that the prosecution, motivated by vindictiveness after the 1998 case, applied such pressure to extract a guilty plea in the 2014 case that the resulting plea was involuntary. (3:17-cv-00002, Doc. No. 1 at 33–37). Specifically, Shakir alleges that it was unethical for the prosecution to use criminal charges against Shakir's relatives, Catherine Lumas and Robyn Shakir, as "only a tool and never the target" to force him to plead guilty in the 2014 case. (<u>Id.</u> at 35).

The government initially contends that this claim is procedurally defaulted, having not been raised at trial or on direct appeal. (3:17cv-00001, Doc. No. 59 at 32.) But it is sometimes appropriate for a court to "reach[] beyond the procedural-default analysis to address the underlying claim on the merits when it 'present[s] a more straightforward ground for decision.'" <u>Wade v. Timmerman-Cooper</u>, 785 F.3d 1059, 1077 (6th Cir. 2015) (quoting <u>Arias v. Hudson</u>, 589 F.3d 315, 316 (6th Cir. 2009)).

In this instance, the most straightforward basis to reject Shakir's claim is that threats to prosecute a defendant's family members may be unseemly, but are not, in themselves, a legally recognized unethical means for a prosecutor to bargain for a plea. Shakir appears to believe that because he was presented with a difficult choice, the choice was necessarily unconstitutional.

31

But that is not so. "[O]penly presenting the defendant with the unpleasant alternatives" is an acceptable part of plea bargaining and does not violate the defendant's right to due process. Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978) (finding no constitutional violation in prosecutor's threat to press more serious charges if the defendant refused to plead guilty). A prosecutor's threats to prosecute a defendant's family members is one of those 'unpleasant alternatives' at the prosecutor's disposal. See Edwards v. United States, No. 2:11-CR-229, 2014 WL 3793953, at *10 (S.D. Ohio July 31, 2014), report and recommendation adopted, No. 2:11-CR-00229, 2014 WL 4437277 (S.D. Ohio Sept. 9, 2014) (denying relief on prosecutorial misconduct claim based on threat to indict defendant's family members in the absence of a guilty plea). Contrary to Shakir's suggestion, "[t]here is no legal requirement that the decision to plead guilty be an easy one." Id. (quoting United States v. Doe, 537 F.3d 204, 213 (2d Cir. 2008)).

It is clear from the Court's records that the bargain regarding the charges against Shakir's relatives was done openly and not as some nefarious, secret scheme to deprive him of his rights. Both the Plea Agreement and the transcript of the plea and sentencing hearing clearly acknowledge that dismissal of the pending indictments against Robyn Shakir and Catherine Lumas was a term of the parties' agreement and would only occur "once Defendant's sentencing [was] completed and his appeal in [the 1998 case was] voluntarily dismissed." (3:17-cv-00001, Doc. No. 42-2 at 28; 3:14-cv-00142, Doc. No. 208 at 11, 24). That bargain is no more a violation of Shakir's rights today than it was at the time it was announced in court.

The outcome might be different, of course, if the government had brought charges against Shakir's relatives for which it lacked any reasonable basis. See Bordenkircher, 434 U.S. at 364 ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what

32

charge to file or bring before a grand jury, generally rests entirely in his discretion."). But Shakir's attempts to suggest that the charges against his relatives were unfounded fail. To begin with, "an indictment fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." Higgason v. Stephens, 288 F.3d 868, 877 (6th Cir. 2002). Shakir alleges generally that the government had relied on false evidence in the 1998 case and must have "proceeded in this fashion" with regard to the new charges in 2014, but he does not provide or discuss any reason to believe that the basis for the charges against his relatives was false. (See 3:17-cv-00002, Doc. No. 1 at 35). To the contrary, he affirmatively admitted in his Plea Agreement in the 2014 case that Robyn Shakir and Catherine Lumas were among several people in California working at his direction to obtain drugs he intended to have sold in Nashville to fund the purchase of a helicopter. (3:17-cv-00001, Doc. No. 42-2 at 13).

Shakir also argues that the charges against his relatives were legally unfounded because they were brought beyond the applicable limitations period. (3:17-cv-00002, Doc. No. 1 at 35). The indictment, returned September 3, 2014, charged that the conspiracy in which the relatives were involved spanned "[b]etween in or around 2008 through a date unknown to the Grand Jury but at least through September 30, 2009." (3:14-cr-000142, Doc. No. 3 at 7–8). The indictment was thus filed before the expiration of the applicable limitations period when measured from the end of the known conspiracy period. See 18 U.S.C. § 3282 (providing that the default statute of limitations for non-capital criminal offenses is five years from the date that the offense was committed). And the possibility that either or both of Shakir's relatives might have had a viable statute-of-limitations defense, based on the dates of facts and events that would have to have been proved at trial, does not establish that the charges were brought unlawfully or in violation

33

of prosecutorial ethics. Moreover, if it were crystal clear, as Shakir suggests, that the charges against his relatives were subject to dismissal based on the statute of limitations, that would have mitigated if not completely negated their usefulness in pressuring him to plead guilty. If his allegation were true, he should have felt little or no pressure by the doomed charges against his relatives. Accordingly, his allegation that the charges against them were untimely does not support this claim.

Shakir's speculation that prosecutorial vindictiveness motivated the government to pressure him to plead guilty in the 2014 case also fails to support his claim. The Supreme Court has held that a prosecutor violates a defendant's due process rights when s/he seeks a more severe sentence or re-indicts with more serious charges for the same events after the defendant successfully seeks a new trial. Bordenkircher, 434 U.S. at 362 (citing North Carolina v. Pearce, 395 U.S. 711, 725 (1969), and Blackledge v. Perry, 417 U.S. 21, 27 (1974)). But Shakir had not succeeded in post-trial motions or on appeal in the 1998 case at the time he pleaded guilty in the 2014 case. And the government did not take any action with respect to the standing convictions or sentences imposed in the 1998 case. If indicting Shakir and his co-conspirators for crimes committed after the 1998 case was initiated were proof of vindictiveness, all defendants would effectively be immunized from further prosecution after their first criminal indictment. The 2014 grand jury indictment and the sixteen pages of detailed facts that Shakir admitted in his Plea Agreement firmly establish that the 2014 case was not unfounded. (3:14-cr-00142, Doc. No. 3; 3:17-cv-00001, Doc. No. 42-2 at 6–22). Accordingly, there is no basis for a finding of prosecutorial vindictiveness in this case.

Shakir is not entitled to relief on this claim.

### E.     Ineffective Assistance in the 2014 Case

"Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." <u>Lafler v. Cooper</u>, 566 U.S. 156, 162 (2012).  The <u>Strickland</u> test applies to "challenges to guilty pleas based on ineffective assistance of counsel." <u>Hill v. Lockhart</u>, 474 U.S. 52, 58 (1985).  When a petitioner claims that "ineffective assistance led to the improvident acceptance of a guilty plea," the prejudice prong of <u>Strickland</u> requires him to "show 'that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.'" <u>Lafler</u>, 566 U.S. at 163 (quoting <u>Hill</u>, 474 U.S. at 59).  The Supreme Court has explained what a heavy burden a petitioner bears in such circumstances:

> "Surmounting <u>Strickland</u>'s high bar is never an easy task," <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010), and the strong societal interest in finality has "special force with respect to convictions based on guilty pleas." <u>United States v. Timmreck</u>, 441 U.S. 780, 784 (1979).  Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences.

<u>Lee v. United States</u>, 137 S. Ct. 1958, 1967 (2017).

Shakir alleges that counsel in his 2014 case was ineffective in five ways:

1. Counsel failed to properly address the concurrent or consecutive nature of his sentence;

2. Counsel failed to assert lack of jurisdiction based on the Interstate Agreement on Detainers;

3. Counsel should not have advised Shakir to waive his "highly meritorious and valid appeal" due to the unconstitutional 2014 charges against Shakir's family members;

4. Counsel failed to assert lack of jurisdiction in the 2014 case based on repetition of the same claims from the 1998 case; and

5. Counsel failed to assert prosecutorial misconduct in forcing Shakir to waive his appellate rights in the 1998 case by threatening to prosecute his family.

(3:17-cv-00002, Doc. No. 1 at 39–40).

35

1. <u>Consecutive Sentencing</u>

It is not entirely clear what Shakir faults his attorney for not doing with regard to the sentence imposed in the 2014 case. As the Court discussed in its previous Memorandum Opinion, the Plea Agreement expressly provided that the new sentence would be consecutive to his sentence in the 1998 case and acknowledged a statute that would also make the new sentence consecutive to the life sentence Shakir was already serving in California:

> Page 2 of the plea agreement expressly provided that "the parties agree the Court will impose a sentence of 20 years' imprisonment, to be served consecutively to all of [Shakir's] federal sentences in [the 1998 case]." (3:17-cv-00001, Doc. No. 42-2 at 2.) But in a footnote appended to that text, the agreement stated that Shakir was then serving a prison sentence on a State of California conviction and that he acknowledged and would not challenge the applicability of 18 U.S.C. § 3585, which governs when a federal sentence begins to run. (<u>Id.</u> at 2 n.1.) During the plea colloquy, the Court asked counsel about the meaning of that footnote. (3:17-cv-00001, Doc. No. 42-4 at 11–12.) Counsel explained that the effect of the referenced statute would be to make Shakir's new sentence consecutive to the California sentence as well as the federal sentence in the 1998 case, and that the defense had not wanted that stated in the agreement "in plain English" because it might jeopardize Shakir's eligibility for certain programs in the California prison. (<u>Id.</u> at 12–13.) Shakir said that he understood the footnote "to a degree," and made further comments to the effect that he understood the consecutive nature of the sentences but not why the footnote was worded the way it was. (<u>Id.</u> at 14–15.)

(3:17-cv-0001, Doc. No. 55 at 9). The Court ultimately explained the order of Shakir's sentences as follows at the plea hearing:

> So as soon as you are released from state custody, the sentence in the earlier case the 98 federal case will begin. And then if that – when that sentence is over, if it ever is, then your sentence on this case will come.

(3:17-cv-00001, Doc. No. 42-4 at 18.) Shakir agreed that he understood that when his state sentence was "over with," then the sentence on "[t]he original federal case" would begin, followed by the new sentence. (<u>Id.</u>)

Shakir asserts that something about counsel's handling of this situation "allowed a constitutional error to stand" (3:17-cv-00002, Doc. No. 1 at 39), but there is nothing

36

unconstitutional about consecutive sentencing. Shakir might be alleging that counsel advised him incorrectly about the order or structure of his sentences. But there is no doubt that by the end of the discussion quoted above at his hearing, Shakir fully understood how his sentences would be served. Moreover, Shakir does not assert that better advice from counsel on this point would have led him to reject the plea offer and go to trial in the 2014 case. Shakir already had multiple federal life sentences to serve consecutively to the one in California (which would not have been affected by the appeal in the 1998 case), and the Court will not presume that when the new sentence would be served would have been a significant sticking point. Accordingly, even if counsel had failed to thoroughly explain before the plea hearing that Shakir's new sentence would be consecutive to all his previous sentences, Shakir clearly suffered no prejudice from that failure.

### 2. Interstate Agreement on Detainers

Shakir alleges that he remained "in limbo" in federal custody for a year after being sentenced in the 1998 case, while the government considered bringing the charges that eventually appeared in the 2014 case, before he was returned to California to continue serving his state sentence there. (3:17-cv-00002, Doc. No. 1 at 20). He claims that this violated the Interstate Agreement on Detainers (IAD), 18 U.S.C. App. 2 § 2, and that his attorney was ineffective for failing to argue that the government lost jurisdiction over the 2014 case as a result of that violation. (Id. at 38, 39). Specifically, Shakir relies on article IV of the IAD, which provides in pertinent part as follows:

> (a) The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available in accordance with article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the State in which the prisoner is incarcerated: Provided,

That the court having jurisdiction of such indictment, information, or complaint shall have duly approved, recorded, and transmitted the request: And provided further, That there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner.

. . .

(e) If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

18 U.S.C. App. 2 § 2, art. IV.

Shakir was sentenced in the 1998 case on December 7, 2009. (3:98-cr-00038, Doc. Nos. 3631, 3641). The record does not reveal when he was returned to California, but Shakir alleges it was sometime in 2010. Accordingly, the trial on the 1998 charges was "had . . . prior to the prisoner's being returned to the original place of imprisonment," in full compliance with the IAD. And, although the government might have had knowledge in 2010 of the factual bases for new charges, it did not file any "indictment, information, or complaint" against Shakir in connection with those new charges until 2014. Accordingly, Shakir's return to California in 2010 had no IAD implications for the 2014 charges. There simply were no pending charges in 2010 subject to dismissal under the IAD as a result of Shakir's transfer to California.

The argument Shakir faults counsel for not raising thus has no merit, and counsel cannot be deemed ineffective for not raising it. See Bennett v. Brewer, 940 F.3d 279, 286 (6th Cir. 2019), cert. denied, 140 S. Ct. 2534 (2020) (noting that "failure to raise a meritless claim is not ineffective assistance"); Mapes v. Coyle, 171 F.3d 408, 427 (6th Cir. 1999) ("Counsel could not be unconstitutionally ineffective for failing to raise these meritless arguments.").

38

### 3. Waiver of Appeal in 1998 Case

In his third and fifth ineffective-assistance issues, Shakir claims that counsel was ineffective for advising him to waive his "highly meritorious" appeal issues in the 1998 case "based on unconstitutionally charging movant's family members under meritless and untimely charges" and for failing to assert that the prosecutor was committing misconduct by pressuring him to do so with threats to prosecute his family members. (3:17-cv-00002, Doc. No. 1 at 39–40). The Court has already explained above that the charges against Shakir's family members were not unfounded and did not constitute misconduct even when used as leverage in negotiations with him. Accordingly, counsel was not ineffective for not making that futile argument or for advising Shakir to take the deal, which the Court has already found was knowing and voluntary on Shakir's part. (3:17-cv-0001, Doc. No. 55).

### 4. Lack of Jurisdiction

Finally, Shakir claims that counsel was ineffective for not asserting that the Court "lacked legal jurisdiction to proceed in [the 2014 case], due to having several of the claims charged a part of the same case under [the 1998 case]." (3:17-cv-00002, Doc. No. 1 at 39). Like the government, the Court is unable to discern the basis for this claim. (See 3:17-cv-00001, Doc. No. 53 at 39). The operative indictment in the 1998 case was filed on September 27, 2002, and charged criminal behavior found by the grand jury to have occurred from 1993 to 1999. (3:98-cr-00038, Doc. No. 1437). And the indictment in the 2014 case charged criminal behavior found by the grand jury to have occurred in 2008 and 2009. (3:14-cr-00142, Doc. No. 3). There is thus no overlap in charges between the two cases. Although both indictments charged Shakir with engaging in a continuing criminal enterprise, a conviction on that charge in the 1998 case did not immunize Shakir from future prosecution based on new criminal behavior. Because Shakir has

not established any viable argument that the Court lacked jurisdiction over the 2014 case, he has failed to establish that his counsel's performance was deficient in connection with this claim.

Shakir is thus not entitled to relief on any of his ineffective-assistance claims in connection with the 2014 case.

## F. Claims Raised in the Reply

In his Reply, Shakir rests on the assertions in his original petitions with respect to all the remaining claims except for the claim regarding prosecutorial misconduct in connection with testimony by Derrick Eatmon and Benjale Cushon. (3:17-cv-00001, Doc. No. 68 at 12–28). That claim is addressed at length and rejected above.

Ostensibly in connection with that claim, Shakir's Reply also asserts "Newly Discovered Evidence" from Lameisha Anderson and Eben Payne. (Id. at 18–27). Anderson's affidavit indicates that she falsely testified at the trial in the 1998 case that she was present with Shakir when Sharon Duran was murdered. She says that the prosecutor knew her testimony was false because she had previously denied during interviews and her grand jury testimony that she had any personal knowledge of Duran's murder. (3:17-cv-00001, Doc. No. 70-1). And the statement from Eben Payne, who did not testify at trial and whose own charges were dropped after he was found incompetent, simply says that Shakir and other gang members "all functioned as equals" and that Payne's "understanding is that many others were given deals to testify against Shakir," although he was not. (3:17-cv-00001, Doc. No. 70-2). Those claims are completely distinct from the claim raised in Shakir's original Motion that the government concealed facts favorable to the defense in connection with the testimony of Eatmon and Cushon.

40

1. <u>New Claims Are Untimely</u>

As the Court explained more than a year ago, the time for Shakir to raise any new claims expired long ago:

> The Court does clarify, however, that its appointment of counsel is for the purpose of preparing and filing any briefs required in connection with Shakir's pending claims to which the government has now responded. The opportunity to file any amendments to the Section 2255 motions expired on November 26, 2018, (3:17-cv-00001, Doc. No. 15), more than twenty-two months after the filing of the original motions. Since that time, many of Shakir's claims have been fully briefed, the Court has ruled on those claims (3:17-cv-00001, Doc. No. 55), and the government has responded to the remaining claims. Any amendments at this stage of the litigation would unfairly prejudice the government and negate the significant amount of time and resources—by both parties and the Court—that have been devoted to reaching this stage of proceedings.

(3:17-cv-00001, Doc. No. 64 at 3).  Shakir has not actually moved to amend or made any effort to demonstrate the elements of good cause or lack of prejudice to the government that would be required to grant such a late amendment. <u>See</u> Fed. R. Civ. P. 16(b)(4) (requiring good cause and the judge's consent to modify a schedule); <u>Leary v. Daeschner</u>, 349 F.3d 888, 909 (6th Cir. 2003) ("Thus, in addition to Rule 16's explicit 'good cause' requirement, we hold that a determination of the potential prejudice to the nonmovant also is required when a district court decides whether or not to amend a scheduling order.").  The Court reiterates its conclusion that any amendment in these cases, which have been pending for four years and to which the government responded over a year ago, would be unduly prejudicial.  Accordingly, these new claims based on the statements of Anderson and Payne are filed in violation of the Court's scheduling orders and are rejected on that basis.

Because the Court's own orders provide a basis for rejecting these claims, it is unnecessary to resolve the parties' dispute about whether they are also barred by the applicable statute of limitations, including whether the newly presented information could have been

discovered earlier through due diligence or relates back to any claims in the original Motions. (See 3:17-cv-00001, Doc. No. 68 at 23–24, 27; 3:17-cv-00001, Doc. No. 72 at 21–25). Likewise, the Court need not resolve the dispute about whether these claims are procedurally defaulted. (See 3:17-cv-00001, Doc. No. 68 at 23–24, 27; 3:17-cv-00001, Doc. No. 72 at 26).

### 2. Newly Presented Evidence Does Not Warrant Relief

The Court does, however, conclude in the alternative that Shakir's newly presented evidence would not entitle him to relief—either independently as new claims or as evidence in support of his original claims—regardless of any procedural bars to its consideration.

#### a. Payne Statement

The statement from Payne in particular does not provide any new, material information. As the discussion of the Eatmon claim above makes clear, that some witnesses cooperated against Shakir as part of plea deals in their own cases was not a secret, and it does not establish any misconduct on the part of the prosecutor. And the theory that Shakir was not the "boss" of other members of the criminal enterprise was part of the defense at trial and was, to some degree, supported by trial testimony, including Eatmon's testimony that Shakir was not his boss. But while there was ample evidence at trial to indicate that Shakir ordered certain things to be done, the government's case did not rise or fall on Shakir's authority over his co-conspirators. As the government argued in closing, "he's responsible for what they did, even if it is only this coconspirator liability, where the defendant didn't even have to know; that it was just reasonably foreseeable and the murders occurred in furtherance of the conspiracy." (3:98-cr-00038, Doc. No. 3149 at 6). The jury's consideration of the parties' competing theories is reflected in its verdicts, and Section 2255 does not provide a venue for Shakir to simply continue litigating that issue.

42

Shakir asserts that "Payne's statement stands in direct contradiction to the government's theory at trial and stands as proof that Shakir is factually and actually innocent." (3:17-cv-00001, Doc. No. 70 at 27). But "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Herrera v. Collins, 506 U.S. 390, 404 (1993). The Court already considered the merits of Shakir's Eatmon claim above and found it did not warrant relief, so this piece of "evidence" does not open any gateway to further consideration of that claim.

Moreover, as the government points out, Payne does not deny that he murdered two people by prior agreement with Shakir. (3:17-cv-00001, Doc. No. 72 at 3–4 n.2). He thus does not establish Shakir's innocence of the multiple crimes in connection with those murders for which Shakir was charged or convicted, none of which had as an element that Shakir ordered Payne as his superior to do anything. (See 3:98-cr-00038, Doc. No. 1437 at 27–36 (Counts 17–26 of the Fifth Superseding Indictment); 3:17-cv-00001, Doc. No. 41-8 at 32–52 (jury's verdicts on those Counts)). Thus, regardless of whether it is offered as its own claim or as a gateway to another, Payne's statement does not amount to "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial," as required to warrant any relief. Schlup v. Delo, 513 U.S. 298, 316 (1995). The threshold inquiry on an issue of actual innocence is whether "new facts raised sufficient doubt about [Petitioner's] guilt to undermine the confidence in the result of the trial." Id. at 317; Reeves v. Fortner, 490 F. App'x 766, 769 (6th Cir. 2012). Payne's statement does not come close to that level.

b. <u>Anderson Affidavit</u>

Anderson's statement is more detailed, but ultimately fails to warrant relief for the same reasons. First, that Anderson had previously denied to the government and the grand jury that she had no personal knowledge of Duran's murder was well known to the defense and to the jury. The prosecutor had Anderson confirm during direct examination that she had lied to the grand jury about not knowing anything about Duran's murder. (3:98-cr-00038, Doc. No. 2850 at 33). She testified that she denied knowing about Duran's murder at the grand jury hearing because she was scared, and that she only told the government about Duran's murder just a few months before trial. (<u>Id.</u>; 3:98-cr-00038, Doc. No. 2862 at 18; 3:98-cr-00038, Doc. No. 2874 at 9). And the defense cross-examined her at length about changing her story, suggesting that she only gave the government information about Duran's murder after spending years in prison awaiting sentencing and in hopes that it would convince the government to release her. (3:98-cr-00038, Doc. No. 2873 at 12, 17–31). Accordingly, nothing about the history of Anderson's conflicting testimony is "newly discovered evidence," as Shakir asserts in his Reply. (3:17-cv-0001, Doc. No. 70 at 18).

Furthermore, the change in Anderson's testimony to implicate Shakir at trial did not accrue to her benefit, as Shakir suggests, because the government revoked its agreement to seek a downward departure in her case due to her previous deceit. Again, Anderson testified about that at trial. (3:98-cr-00038, Doc. No. 2850 at 38; 3:98-cr-00038, Doc. No. 2869 at 48–49). On re-direct, she even acknowledged that she had asked the government to reinstate the agreement to seek a downward departure and that the government had refused without any hesitation or any hope for that to happen.[6] (3:98-cr-00038, Doc. No. 2873 at 33). The defense was thus free to

---

[6]     Indeed, the government ultimately not only revoked the plea agreement and withheld the request for a downward departure, it argued in favor of applying a sentencing cross-reference based on

impeach Anderson with her inconsistent statements and suspected motives to lie at trial, and the jury was free to determine the credibility of her testimony.

Unlike Anderson's trial testimony—which was thorough, tested on cross-examination, credible, and resulted in no benefit to her—there are obvious reasons to question the credibility of her recent affidavit. As the Court discussed above, Shakir has admitted to plotting to retaliate against witnesses. He also attempted to control the evidence Anderson, in particular, would provide. In the wake of the murder of a woman Shakir had suspected might cooperate against him, he warned Anderson that the same thing could happen to her. (3:98-cr-00038, Doc. No. 2864 at 15–20, 28). After they were arrested, he mentioned during a phone call he made from detention that he was trying to "rap to her to keep her mind right," which Anderson believed meant to keep her from testifying. (3:98-cr-00038, Doc. No. 2850 at 34–35; 3:98-cr-00038, Doc. No. 2864 at 13–14). And while they were in pre-trial detention, Shakir sent Anderson a handwritten instruction to copy and execute two false declarations to benefit his case. (3:98-cr-00038, Doc. No. 2863 at 19–41; 3:98-cr-00038, Doc. No. 2864 at 3–8). Much like the affidavit submitted in this case, one of those false declarations Shakir wanted Anderson to execute complained that government agents effectively forced her to falsely implicate Shakir or face life

---

Anderson's admitted involvement in Duran's murder that increased her guideline range to life in prison (although the guideline was overridden by statutory maximums of 30 years and 20 years for her counts of conviction). (3:98-cr-00038, Doc. No. 4077 at 12, 18, 30; 3:98-cr-00038, Doc. No. 4078 at 3–9). Anderson contested the application of that cross-reference but acknowledged, through counsel, that the proof would establish that she was an "accessory after the fact" to Duran's murder by driving Shakir away from the murder scene. (3:98-cr-00038, Doc. No. 4078 at 3, 16–17). The trial judge ruled that the murder cross-reference applied to Anderson's case. (Id. at 18–19). There was thus no duplicity involved in Anderson's testimony with regard to any benefit she would receive from the government. Nor was there any misconduct involved in the prosecutor's revoking Anderson's agreement and pursuing a harsher sentence, including application of the murder cross-reference that increased her guideline range to life. Those actions were public and transparent, as reflected in the Court of Appeals's opinion in Anderson's appeal, which recounted the history of her failed agreement and held that the cross-reference was properly applied. United States v. Anderson, 795 F.3d 613, 615–17 (6th Cir. 2015). At no point in the litigation or appeal of Anderson's objection to the cross-reference did she ever recant her testimony about her involvement with Duran's murder. As the government asserts, this "speaks volumes" about the truthfulness of her involvement. (3:17-cv-00001, Doc. No. 72 at 17).

45

in prison. (3:98-cr-00038, Doc. No. 2864 at 7–8).  And, as the government points out, the timing of Anderson's affidavit—more than thirteen years after her testimony and long after the limitations period in which she could have been prosecuted for perjury for her trial testimony but shortly after her compassionate release from prison and visit to the son she shares with Shakir—is quite suspect.  See Benning v. Warden, Lebanon Corr. Inst., 345 F. App'x 149, 161 (6th Cir. 2009) (discussing suspicious timing of affidavit where affiant is shielded from prosecution); (3:17-cv-00001, Doc. No. 72 at 15, 19; 3:98-cr-00038, Doc. Nos. 4212, 4219).  The renewal of those familial ties is cause for heightened skepticism about the credibility of her recanting affidavit. United States v. Coker, 23 F. App'x 411, 412 (6th Cir. 2001).

For all these reasons, the Court "firmly believes" that Anderson testified truthfully at trial, that her recent affidavit lacks any credibility by comparison, and that this claim does not merit further consideration.  See Corona v. United States, No. 3:05-CR-148, 2018 WL 283252, at *2–3 (E.D. Tenn. Jan. 3, 2018) (explaining that when a court "firmly believes" that the recanting witness testified truthfully at trial "there is no need for an evidentiary hearing").  Moreover, the Court observes that Anderson's statement does not establish or even assert that Shakir is innocent of killing Duran.  To the contrary, the statement says that Anderson "had heard the story [of the murder that she] repeated at trial." (3:17-cv-00001, Doc. No. 70-1 at 1).  The statement merely indicates that Anderson was not personally present at the murder as she testified she was.  But the "mere legal insufficiency" of evidence to support a conviction does not constitute evidence of "actual innocence" as required to warrant any relief. Bousley v. United States, 523 U.S. 614, 623 (1998).

## V.  WHETHER A HEARING IS REQUIRED

A prisoner who files a motion under Section 2255 challenging a federal conviction is generally entitled to "a prompt hearing" at which the district court is to "determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255.  The hearing is mandatory "unless 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" Fontaine v. United States, 411 U.S. 213, 215 (1973) (quoting 28 U.S.C. § 2255(b)).  Thus, "no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." Valentine v. United States, 488 F.3d 325, 333 (6th Cir. 2007) (quoting Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999)).

Rule 4(b) of the Rules Governing § 2255 Proceedings provides that if it plainly appears from the face of the § 2255 motion, exhibits, and prior proceedings that the petitioner is not entitled to relief, the judge shall make an order for its summary dismissal.  Upon consideration of the original Motions, the parties' briefs and evidence, and the underlying factual record, the Court has found above that Shakir's claims are either legally unfounded or factually incredible to such an extent that a hearing would serve no purpose.  The Court thus concludes that there are no genuine evidentiary issues to be resolved in this case and that an evidentiary hearing is not required.  The Court will therefore dispose of the Motions as the law and justice require. Rule 8(a), Rules Gov'g § 2255 Cases.

## VI.  CONCLUSION

For the reasons set forth above, the Court finds that Shakir is not entitled to relief on any of his claims.  The court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to a Section 2255 movant. Rule 11(a), Rules Gov'g § 2255 Cases.  A movant

47

may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the movant "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). "[A] COA does not require a showing that the appeal will succeed," Miller-El, 537 U.S. at 337, but courts should not issue a COA as a matter of course. Id.

The Court has "engage[d] in a reasoned assessment of each claim" to determine whether its rulings on the waiver issue (see Doc. Nos. 55–56) or the claims addressed herein are sincerely debatable by reasonable jurists and finds that they are not. Murphy v. Ohio, 263 F.3d 466, 467 (6th Cir. 2001). This is true even with regard to the recanting-witness statements, which the Court is firmly convinced are false. See Corona v. United States, No. 3:05-CR-148, 2018 WL 283252, at *3 (E.D. Tenn. Jan. 3, 2018) (denying COA on claim based on recanting witness because "reasonable jurists could not conclude that petitioner's claim is adequate to deserve further review"); certificate of appealability denied, No. 20-5051 (6th Cir. June 23, 2020) (rejecting argument "that the district court erred in denying his § 2255 motion without holding an evidentiary hearing"). Because Shakir has failed to make a substantial showing of a denial of a constitutional right, the court will deny a certificate of appealability. See Castro v. United States, 310 F.3d 900 (6th Cir. 2002) ("A petitioner is entitled to a COA only if he 'has made a substantial showing of the denial of a constitutional right.' 28 U.S.C. § 2253(c)(2).").

An appropriate Order shall enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE